FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Guy Cardamone, Madison Supervisor
John W. Campion
Alexandra Douglas
Ramuel R. Figueroa
Matthew Giesfeldt
Jonathan Greenberg
Gabriela A. Leija
Julie K. Linnen
Colin McGinn
Dennise Moreno
Tom Phillip
Alex Vlisides

411 East Wisconsin Avenue
Suite 2310
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

August 20, 2026

Honorable Pamela Pepper, Chief Judge
United States District Court
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE: *United States v. Derick Day*
Case No. 25-cr-00047

Dear Judge Pepper:

Derick Day first entered prison at just 15 years old. He emerged nearly two decades later, having never lived in the community as an adult. During his incarceration, he worked hard to set himself up for success after prison; he earned his GED, got his welding certification, and became a talented painter. Once he was released, he reconnected with his family, obtained stable employment, and began the difficult process of constructing a new life from the ground up.

Unfortunately, Mr. Day jeopardized that progress when he made the unlawful and poor decision to possess a firearm. He does not excuse that conduct. But the context of his offense matters. For more than a year, an increasingly unstable individual – the ex-boyfriend of Mr. Day's niece – had repeatedly threatened and attacked Mr. Day's family, damaged their property, and continued appearing at their home. Mr. Day and his family took all the steps they were supposed to – they contacted the authorities, got a restraining order, and followed through with the court process. But when that individual was released after only a few months in custody, Mr. Day armed himself out of fear for his

family's safety. His actions were certainly misguided, counterproductive, and unlawful, but Mr. Day did not arm himself to engage in further criminal activity. He did not brandish the firearm, engage in any violence with it, or use it to protect contraband or ill-gotten proceeds. Rather, he was trying to protect himself and his family.

Mr. Day recognizes that whatever his intent, he was prohibited from possessing a firearm and his conduct was unlawful. He fully accepts responsibility for his decisions, and he understands that he must face the consequences for them.

Mr. Day asks the Court to adopt the parties' joint recommendation of 66 months' imprisonment, adjusted to 54 months to account for the one-year revocation sentence Mr. Day has already completed for the same underlying conduct. That sentence is substantial – it is above the very high end of the advisory range of 27 to 33 months under the guidelines – and appropriately reflects the seriousness of the offense. It is also sufficient to accomplish the goals of sentencing, particularly in light of Mr. Day's perfect compliance with pretrial supervision and demonstrated ability to live a law-abiding, productive, and well-adjusted life.

## BACKGROUND

### *Mr. Day's path to the criminal system began with significant early life instability.*

There are few people who have felt the impact of the carceral system as deeply as Derick Day. When he was just 12 years old, his mother was arrested on drug charges and sentenced to 5 years in prison.[1] Mr. Day's father had passed away several years earlier, leaving him and his two siblings with their maternal grandmother, Vera, as their sole caretaker.

Vera did her best to raise her three grandchildren on her own, but it wasn't an easy feat. Making ends meet was difficult, and the family would sometimes rely on food pantries to supplement the groceries they could afford to buy. But more than the financial struggle, Vera struggled to shield her grandchildren from the crime and violence that

[1] *See* Wisconsin Circuit Court Access, *State of Wisconsin v. Lenda D. Coleman*, Winnebago County Case No. 1999CF000467, available at:
https://wcca.wicourts.gov/caseDetail.html?caseNo=1999CF000467&countyNo=70&index=0&mode=details.

surrounded them. Mr. Day grew up on Milwaukee's North Side, where he was exposed to gun violence, drug activity, and gangs at every corner. With both of his parents out of his life, Mr. Day quickly lost structure and stability in his life. Soon enough, he got involved in the wrong crowds. At just 14 years old, Mr. Day was arrested for the first time, driving a vehicle one of his older friends had stolen. PSR ¶ 32. At just 15 years old, Mr. Day was arrested again, this time after he participated in a string of robberies with older friends of his. Before he could even legally drive, Mr. Day was sentenced to a staggering 20 years in prison and 15 years of extended supervision. PSR ¶ 31.

While the conduct that resulted in the harsh sentence was undoubtedly serious, it bears repeating that Mr. Day was just a teenager at the time. As the Sentencing Commission explains in its policy statement on age "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood." USSG 5H1.1. For those very reasons, courts have often recognized that "juveniles have diminished culpability and greater prospects for reform," making them "less deserving of the most severe punishments." *Miller v. Alabama*, 567 U.S. 460, 471 (2012). With that context in mind, it's relevant not only that Mr. Day was just 15 years old at the time of those robberies, but also that he did not commit them on his own. Instead, the robberies were committed by a group, of which Mr. Day was the youngest. That's precisely an example of the "susceptibility to outside influence" and peer groups that make offenses committed by juveniles different and not reflective of incorrigibility.

It was difficult, at first, for Mr. Day to wrap his head around a 20-year sentence. After all, he had not even been alive for 20 years. He was about to spend more years in prison than his entire lifetime to that point. It was a difficult thing to fathom. While many people facing such a prospect might feel resigned, defeated, or hopeless, Mr. Day was committed to using his time behind bars to better himself. While incarcerated, Mr. Day successfully obtained his GED, and he completed a welding certification program – twice (he was desperate to keep himself productive and busy, and finding new programming over the course of a 20-year sentence was difficult). PSR ¶¶ 43, 56-57 (noting that Mr. Day obtained a GPA of 3.75 when he completed the welding program at MATC).

Mr. Day also took up oil painting during his incarceration. He saved up to buy himself supplies and spent his days practicing. Entirely self-taught, Mr. Day has become quite a talented artist. Below are just a few of his pieces:







Once he was released, Mr. Day never wanted to return to prison again. He had spent 20 years thinking about the life he wanted to build once he was out in the community again, and he was determined to put his plans into action. But while the reentry process is difficult for anyone, Mr. Day faced some unique challenges: he had never lived in the community as an adult. Mr. Day, therefore, wasn't rebuilding a life; he was starting one from scratch.

Fortunately, his family was very supportive. Upon his release, Mr. Day moved in with his mother, sister, and his sister's children.





**Mr. Day with his family.**

> ***Mr. Day committed this offense of unlawfully possessing a firearm after his family was repeatedly harassed and threatened.***

At first, things were going well for Mr. Day. He was reconnecting with his family, he found stable employment, PSR ¶ 61, and he was dutifully reporting to his state probation officer, PSR ¶ 31. However, in late 2023, things began to take a turn.

Around November of that year, Mr. Day's then 18-year-old niece, Kaleanna Coleman, ended her relationship with an abusive boyfriend, Travarius McIntyre. Following the breakup, Mr. McIntyre became increasingly violent and unstable. On several occasions,

he showed up at the family home, threatened, and even physically attacked Ms. Coleman and her family, including Mr. Day.

Ms. Coleman sought and obtained a restraining order against Mr. McIntyre in November 2023. *See* Ex. A, TRO Petitions.[2] In her petition for the restraining order, Ms. Coleman outlined how Mr. McIntyre repeatedly came to the family's home and acted violently. She described an incident, for example, where Mr. McIntyre went to the home with a bat and threatened the family. He eventually threw the bat at her uncle – that is, Mr. Day. In another incident Ms. Coleman described, Mr. McIntyre poured hot grease into her mother's vehicle in an attempt to cause a fire; got physical with her younger sister, leaving her with bruises; and slashed her mother's car tires. And in yet another incident, Mr. McIntyre threw a homemade Molotov cocktail at Mr. Day's car. Ms. Coleman explained that Mr. McIntyre frequently threatened her and her family's lives, saying "he was going to shoot [her] twice in the head." Based on these incidents, Ms. Coleman was granted a multi-year injunction against Mr. McIntyre in November 2023.[3]

However, the threats and harassment did not stop. Undeterred by the injunction, Mr. McIntyre continued to show up to the home. Mr. Day's family has shared several video examples with undersigned counsel showing Mr. McIntyre at their home, and there are several police reports documenting some of the incidents where Mr. McIntyre continued to stalk and harass the family, in direct violation of the domestic violence restraining order. In December 2023, for example, Mr. McIntyre went to the home in a ski mask, armed with a knife, and threatened to stab Ms. Coleman. *See* Ex. B, December 2023 Police Report. On April 17, 2024, the police were again called because Mr. McIntyre was outside of the residence, again in violation of his restraining order. *See* Ex. C, April 2024 Police Report. The police were called to the home yet again on July 13, 2024, after Mr. McIntyre attempted to break into the home with a knife in his hand. *See* Ex. D, July 13, 2024 Police Report. And again a few weeks later, on July 29, 2024, when Mr. McIntyre appeared at the home and told Ms. Coleman, "when I see you, I'm going to kill you," and "when I catch you, I'm going to set you on fire." *See* Ex. E, July 29, 2024 Police Report. Mr.

---

[2] Given the sensitive nature of the allegations and the personal details regarding Mr. Day and his family contained in the TRO petitions and related police reports, Mr. Day intends to seek leave to file the exhibits under separate cover and under seal.

[3] *See* Wisconsin Circuit Court Access, *Petitioner vs. Tavarius Mcintyre*, Milwaukee County Case No. 2023FA6831, available at:
[https://wcca.wicourts.gov/caseDetail.html?caseNo=2023FA006831&countyNo=40&mode=details](https://wcca.wicourts.gov/caseDetail.html?caseNo=2023FA006831&countyNo=40&mode=details).

McIntyre also threatened that he was going to "shoot down the house" on that occasion. *Id.*

Mr. McIntyre was eventually arrested for violating the restraining order in July 2024.[4] He remained in custody until his plea and sentencing on October 29, 2024. *Id.* On that date, Mr. McIntyre pleaded guilty and was sentenced to 180 days HOC time, imposed and stayed in favor of 12 months of probation. As a result, he was released that same day, at the end of October 2024. Notably, because of his history of harassing not only Ms. Coleman, but her family as well, Mr. McIntyre was ordered to have no contact with several members of Ms. Coleman's family, including "DLD" – that is, Mr. Day. *See id.*, Plea/Sentencing Minutes.

The family was fearful when Mr. McIntyre was released given his increasingly erratic behavior over the past year and the fact that their diligence in calling the police and documenting his harassment had put him behind bars for several months. They worried that Mr. McIntyre would seek to retaliate. Mr. Day was desperate for a way to protect his loved ones – a responsibility he felt he carried on his shoulders. In that desperation, he made the very counterproductive and misguided decision to arm himself. Because Mr. McIntyre had targeted Mr. Day's car in the Molotov cocktail incident, Mr. Day also kept the firearm with him in his vehicle. Mr. Day was stopped about a month later, in December 2024, with the firearm in his vehicle, leading to his arrest for the instant offense. Mr. McIntyre, for his part, would go on to be charged with battery a few months later.[5]

Of course, none of this excuses Mr. Day's poor decisions. The fact remains that he armed himself when he was prohibited from possessing a firearm. However, Mr. Day never brandished or discharged the firearm, nor did he use it in connection with any other offense. Rather, he armed himself because he was worried for the safety of his family. While that doesn't absolve him of criminal responsibility entirely, it should factor into this Court's sentencing decision.

---

[4] *See* Wisconsin Circuit Court Access, *State of Wisconsin vs. Tavarius Eshawn McIntyre*, Milwaukee County Case No. 2024CM2094, *available at:* *https://wcca.wicourts.gov/caseDetail.html?caseNo=2024CM002094&countyNo=40&index=0&mode=details*.

[5] *See* Wisconsin Circuit Court Access, *State of Wisconsin vs. Tavarius Eshawn McIntyre*, Milwaukee County Case No. 2025CM1921, available at: https://wcca.wicourts.gov/caseDetail.html?caseNo=2025CM001921&countyNo=40&index=0&mode=details.

**SENTENCING CONSIDERATIONS**

As part of the plea agreement in this case, the parties have agreed to jointly recommend a sentence of 66 months in prison, adjusted for the 12-month state revocation sentence Mr. Day has already served for the same underlying conduct. *See* PSR ¶ 31 (noting Mr. Day was taken into state custody on December 11, 2024, and released from his revocation sentence on December 9, 2025). In effect, then, the parties are requesting that this Court impose a sentence of 54 months.

That sentence adequately reflects the seriousness of Mr. Day's offense – indeed, it is well above the top end of recommended sentencing range under the guidelines. *See* PSR ¶ 67 (calculating Mr. Day's range as 27 to 33 months).

The parties reached that joint recommendation after significant discussion regarding the offense, Mr. Day's history, and the threats Mr. Day and his family were facing. Although the government originally charged Mr. Day with the 15-year mandatory minimum under the Armed Career Criminal Act ("ACCA"), it agreed as part of the parties' resolution to dismiss the enhanced penalty and restore the Court's sentencing discretion. That agreement appropriately recognizes that while Mr. Day's prior robberies were unquestionably serious, in many ways, Mr. Day was not the prototypical ACCA defendant.

As the Supreme Court and legislative history make clear, Congress intended ACCA to address "armed career criminals," or "those who commit a large number of fairly serious crimes as their means of livelihood." *Wooden v. United States*, 595 U.S. 360, 375 (2022). Put another way, the statute was intended to reach and apply to "revolving door felons," meaning individuals who continue to commit serious offenses over a course of time, undeterred by the criminal system. *Id.* Mr. Day does not really fit the bill. All of his predicate offenses came from a single case – they were all robberies, committed over the course of a few weeks, more than 20 years ago (in October 2002). This is not a case where the defendant was repeatedly arrested, sentenced, served a period of confinement, and nevertheless continued to commit violent acts. Instead, Mr. Day accrued all of his predicates in short order before any arrests or interventions of any kind.
There's also the fact that Mr. Day was only 15 years old at the time of all his predicate offenses. Given his youth at the time of those offenses, the robberies that make up Mr.

Day's predicates here are even less indicative of the type of incorrigibility that ACCA was meant to address.[6]

Mr. Day is certainly grateful to the government for using its prosecutorial discretion to recognize that the unique circumstances of his offense and criminal history warranted departure from the rigidity of ACCA and for allowing this Court to use its discretion to craft an individualized sentence in this case, unanchored by the enhanced ACCA penalties.

***Mr. Day's progress since his offense.***

Following his release from his revocation sentence, Mr. Day was committed to demonstrating to his family and this Court that he was capable of living a productive, law-abiding life – and he has done just that. As the Presentence Report notes, "[a]ccording to Pretrial Services, [Mr. Day] has maintained a positive adjustment to supervision, and no violations have been reported to date." PSR ¶ 4. He has submitted four random drug tests during his supervision, between December 12, 2025, and June 16, 2026, and all have been negative for any controlled substances, PSR ¶ 54; he has continued to maintain stable employment throughout his period of pretrial supervision, PSR ¶¶ 58-59; and, very recently, Mr. Day learned that he is going to be a father.

The baby – Mr. Day's first – is due to be born in February of next year. While the news of the baby was a welcome surprise for Mr. Day, the timing has been weighing heavily on him. Mr. Day knows better than anyone what it's like to grow up with a parent behind bars. It's not a fate he ever would have wished on his own children. Mr. Day can't help but think of all the milestones he will miss; he won't be there for his baby's first steps, her first birthday, or her first words.  He takes some solace in the fact that his baby will likely be too young to remember his absence. But he deeply regrets the choices that mean his

[6] While the rigidity of ACCA does not sufficiently account for the mitigating effects of youth, the statute *does* contemplate some different treatment for juvenile offenses. Specifically, the statute says that acts of juvenile delinquency can only count as predicate "violent felonies" if they involve "the use or carrying of a firearm, knife, or destructive device" – a far more narrow definition than the one applied to adult convictions. 18 USC § 924(e)(2)(B). Notably, under that definition, many of Mr. Day's prior robberies would not count as valid predicates because he carried a BB gun – not an actual firearm. *See* PSR ¶ 31. Unfortunately, Mr. Day would not have received the benefit of that more limited definition even though he was only 15 years old at the time of his priors because, despite his age, he was prosecuted as an adult. Nevertheless, the fact that Mr. Day was a juvenile at the time of his predicate offenses is another way in which he was not an especially good fit for the ACCA enhancement.

first child won't know him for the first years of her life. While Mr. Day can't change his past decisions that put him and his family in this position, he is intent on never finding himself before this or any Court ever again, and he has more motivation than ever to stay on the right track.

## CONCLUSION

Mr. Day's possession of a firearm was unlawful, and Mr. Day accepts full responsibility for that decision. But the nature and circumstances of Mr. Day's offense distinguish it from many other firearm cases that come before this Court. Mr. Day possessed the firearm after his family had endured many months of documented threats, violence, and harassment despite seeking protection and help through lawful channels. When the opportunity to purchase a firearm presented itself to him, Mr. Day thought it would help protect his family. He did not use the firearm to engage in any violence or other criminal conduct beyond his possession of it. That should factor into this Court's sentencing decision. Further, since completing his state revocation sentence arising from this conduct, Mr. Day has done everything he can to show his remorse for breaking the law, and his commitment to never doing anything like that again. He has maintained stable employment, consistently tested negative for all controlled substances, and complied fully with every condition of his pretrial supervision.

A sentence of 66 months, adjusted to 54 months for the revocation sentence, is therefore sufficient to meet the goals of sentencing here.

Sincerely,

*/s/ Dennise Moreno*